WILLIAM TWOMBLY & wife *vs.* JOHN T. G. LEACH.

A declaration by a husband and wife against a physician for malpractice alleged that the defendant fraudulently represented to the female plaintiff that she was doing well, in consequence of which she did not apply to other physicians, and thereby lost the use of her hand, but there was no evidence that the plaintiffs desired to call in any other physician. *Held*, that a witness could not be asked what effect was produced upon his mind by the declarations of the defendant concerning another physician in the same town.

In such an action, evidence is not competent for the plaintiff to show the effect of the remedies prescribed by the defendant for the wife, upon a person entirely well; nor to prove that the husband was unable to labor, and dependent upon his wife for his support, there being no allegation in the declaration of a loss of the wife's services.

VOL. XI. 34

---

---

In an action against a physician for unskilful treatment of a cut upon the plaintiff's
thumb, several physicians testified that the disease of the thumb was a felon,
which often resulted from a punctured wound. *Held,* that it was not competent
to inquire of the plaintiff's nurse, who had attended her during all the time, when
she first heard of a punctured wound in connection with the injury, it not appear-
ing that the defendant had ever assigned that cause as the origin of the disease.

In such an action, there was evidence tending to show that the defendant did not
communicate to the plaintiff the nature of the disease, but that he opened her
thumb, giving as a reason that there was a nerve partly cut off, and it would be
better to cut it entirely off. *Held,* that other physicians could not be asked : " Is
it good medical practice *to say* you opened a thumb to cut off a nerve, because it
is already partly cut off ?

In such action it is competent for the defendant to prove that physicians, in address-
ing their patients, often call the tendon of the thumb a nerve; and that it is good
medical treatment in some cases for physicians to withhold from a patient the
extent of their disease and their actual condition; and that the treatment of the
disease, as detailed by the principal witness for the plaintiffs, was proper in the
opinion of medical men.

THIS was an action on the case against a physician and
surgeon for malpractice, commenced February 18th, 1850.

The first count alleged that the plaintiffs employed the de-
fendant to heal a cut, wound, and injury of the female plaintiff's
thumb, and the defendant promised to heal the same; yet
regardless of his duty and promise, he so unskilfully conducted,
that it was not healed, through his bad treatment, &c. The
second count alleged that the defendant fraudulently repre-
sented to the female plaintiff that her hand was getting well, and
in consequence of it she failed to apply to other physicians, so
that she lost the use of her hand. It was tried in the court of
common pleas, before *Mellen,* J. who signed the following
bill of exceptions : " Lucinda P. Twombly, a witness for the
plaintiffs, testified that upon a Friday, in February, 1849, the
female plaintiff, while coring dried apples with a knife, cut her
right thumb, making a long cut just through the skin, out of
which blood oozed, but not enough to drop; that she then
laid aside her knife, and went to work sewing, which she con-
tinued to do during the day and part of the next day; that
while eating dinner on Saturday, she complained of her thumb
being a little sore; that it pained her during the afternoon;
that lye was applied to the thumb, and then a poultice; that
at about 4 o'clock she was taken very sick at the stomach

with some pain in her thumb, and pain and distress in her stomach, back, and head; that after vomiting, she felt some relieved; that the defendant was sent for, and arrived at about 6 o'clock P. M.; that he applied remedies; that when he left, he directed the application of leeches, if the hand should swell; that it did swell that evening, and they applied leeches; that the defendant came again, very early in the morning, applied remedies, and directed them to send for him, if red streaks should appear running up the arm; that these streaks did appear before noon, when the defendant was again sent for, and came and opened the thumb; that nothing but fresh blood came from it; that the inflammation continued severe for a few days, extending up the hand and arm; that the defendant attended upon her, and administered to her about seven weeks, at the end of which time she was so far recovered as to be able to go out of the city of Lowell, where she resided, on a journey, since which time the defendant has not attended her, and that her hand and fingers have become stiff and useless. This witness testified that she was with the female plaintiff from the time of her injury until the defendant ceased to attend her, and she described the appearance and symptoms of the patient, and the treatment by the defendant during that time.

Another witness for the plaintiffs testified that at one period the defendant spoke of the patient's hand as doing well; said she ought to be thankful it was doing so well; that there was not one surgeon in ten but would have taken her hand off; that he knew Dr. Kimball, a physician and surgeon of Lowell, would, and he spoke of a case where he himself had cured a boy's arm, without amputation, when Dr. Kimball wanted to cut it off. The court, overruling the defendant's objections thereto, permitted the plaintiffs to put to this witness the following questions, which were answered as given below:

Question. What effect, if any, had this talk about Dr. Kimball on yourself, your mother, or your family?

Answer. We thought from the way he represented, Dr. K must be a very bad cruel man.

Question. What effect as to calling him?

Answer. We did not think of calling him in after having heard such a representation of him.

There was no evidence in the case that the plaintiffs ever desired to call in Dr. Kimball or ever desired a consultation with any other physician and surgeon.

Sugar of lead water was among the remedies recommended by the defendant for the arm. The sugar of lead was bought of an apothecary by the plaintiffs. The plaintiffs offered to show by the person who applied this wash to the arm of the patient for several days, the effect of it on her own hand; that it made her own wrist lame; that her wrist had never troubled her before; but that she had since felt the lameness, several times; that she was obliged to discontinue bathing the arm herself, and that afterwards some one else made the application of the wash. The defendant objected to the admission of this testimony, but the objection was overruled, and the testimony admitted.

The plaintiffs offered to prove that the husband plaintiff was an invalid, unable to labor, and dependent on the labor of his wife for his support, to the admission of which testimony the defendant objected, but the same was admitted.

A physician and surgeon, called by the defendant, testified that on Tuesday morning after the accident, at the request of the defendant, he visited the patient in company with the defendant; that her arm was then very badly swollen, and gangrene was apprehended; that the inflammation in the hand had somewhat subsided; that his attention was principally called to the arm to see what could be done to prevent gangrene, and whether it needed opening; that the defendant, in the presence of the patient, told what remedies he had applied, but did not call his attention to the thumb, or speak of having opened it, and witness did not examine it; that the defendant told the patient that the witness had come in at the defendant's request, and without charge to her; that they concluded then that the arm did not need opening, and that no material change should be made as to treatment. This witness further testified that he thought he could prescribe properly for the arm at that time, without knowing what had been done to the thumb.

Several physicians and surgeons, called by defendant, tes-tified that from the symptoms stated by the witnesses, the disease under which the patient was laboring was, in their opinion, a deep-seated acute inflammation of the thumb, called whitlow or felon; that early and deep incision, and applica-tions which they named, were the usual and proper remedies for a felon or whitlow, among others, sugar of lead water, when the inflammation extended to the hand and arm; that this disease was often very severe, unyielding to the best treat-ment, and ending sometimes in the loss of the bones of the fingers, stiffness of the fingers, hand, and arm, and sometimes fatally; that it often occurred from a punctured wound, from bruises and lacerated wounds, and often without any assign-able cause, but more rarely from cuts; that the incision should sometimes be made down through the *fascia* and *sheaths* of the tendon and the tendon to the bone; that it is proper to make the incision before matter is formed, to relieve the tense-ness and prevent the formation of matter, and that it would be proper to renew an incision, in case a first incision was found not to be deep enough or effectual; that there were no nerves in the ball of the thumb that could be partly cut off, only filaments of nerves, and that it would not be a good reason for opening the thumb that a nerve was partly cut off.

There was evidence tending to show that the defendant did not communicate to the plaintiffs what the disease was; that he opened the thumb on his first visit; that on the next day at noon, he again opened the thumb, assigning as a reason that there was a nerve partly cut off, and that it would be better to cut it wholly off.

The court permitted the following questions to be put by the plaintiffs, and answered by the witnesses, the defendant objecting thereto:

Question to Lucinda P. Twombly. When did you first hear of a punctured wound in connection with this injury?

Answer. Never till a former trial of the case.

Question to the physicians and surgeons. Is it good med-ical practice *to say* you open a thumb to cut off a nerve because it is already partly cut off?

34 *

Answer. It is not.

The defendant proposed to ask the several physicians and surgeons, who had heard the testimony of Lucinda P. Twombly, the following questions, but the court ruled that the testimony was not admissible, and would not permit the questions to be asked.

Is not the *theca* of the tendon, or the tendon itself, often called a nerve by physicians and surgeons when addressing non-professional persons ?

Whether or not is it good medical treatment in some cases to withhold from the patient the extent of the disease, and her actual condition ?

From the symptoms and particulars of the patient's state, and the treatment by the defendant as testified to by Lucinda P. Twombly, was that treatment in conformity with, or a departure from, the rules and practice of the medical profession ?

From the symptoms and particulars of the patient's state, and the treatment by the defendant, as testified to by Lucinda P. Twombly, do you see any evidence of bad treatment, or malpractice, according to the rules of the healing art, as laid down and practised by the medical faculty ?

The defendant further proposed to give in evidence the opinions of the same physicians and surgeons as to whether there was any want of skill, bad treatment, or malpractice in the treatment by the defendant, as narrated by said Lucinda ; but the court ruled that such opinions would not be competent, and refused to admit them in evidence.

Dr. Jenness, a botanic physician, called by the defendant, stated that in September, after the injury, the female plaintiff called on him and gave him an account of how she was injured; which he narrated, on direct examination, as follows : On examination of her hand, I asked her the cause of its present appearance, and she said that in washing she felt a prick on her thumb, and she took her hand out and examined, and she could find nothing in it; that she soon felt the prick again.   After this her thumb began paining her; that swelling ensued, and a red streaking, running up her arm

and paining her. Something was said by her about symptoms or fears of lockjaw, but whether these were at first or not I cannot say, or whether or not before calling in the defendant; but I think the fears were before calling in the defendant. She spoke of the application of poultices to the thumb, and, I think, of soaking it. She said she sent for the defendant, and that he opened her thumb, and showed me where. She spoke of having been away, and of her hand having been treated, but not of the manner of its treatment. She said she had consulted other physicians.

On cross-examination the court permitted the following questions to be put by the plaintiffs, (defendant objecting thereto,) directing the witness to confine his answer to the time he had spoken of in his examination in chief.

Question. Do you recollect of giving her your opinion in this conversation that she could recover damages ?

Answer. I could not say that I did or did not give such an opinion.

Question. From the story she told you, have you ever given an opinion that she had a ground of action for ill treatment?

Answer. I have no recollection that I gave such an opinion ; can't say I did not.

The plaintiffs then proposed to prove by said Lucinda, that she was with the female plaintiff when she called on Jenness, at the time of the conversation testified to by him, that she then told Jenness that Dr. Balch had told her that the defendant ought to be prosecuted, and that Jenness said he didn't see why damages could not be recovered for a hand left in that condition. The defendant objected to admission of this testimony, but the same was admitted.

The case was submitted to the jury, who returned a verdict for the plaintiffs. And to the foregoing rulings the defendant excepted.

The case was submitted on written arguments by *D. S. & W. A. Richardson, & T. Wentworth,* for the defendant, and by *B. F. Butler,* for the plaintiffs.

MERRICK, J. The bill of exceptions discloses several questions arising both from the admission of evidence, to which

the defendant objected, and from the rejection of evidence which he offered to produce.

1. The inquiry as to the effect, upon the minds of the witness, her mother, and family, of the remarks said to have been made by the defendant concerning Dr. Kimball, was wholly immaterial. There was no evidence in the case that the plaintiffs ever desired to call in Dr. Kimball, either for aid or consultation; and it does not appear from any thing stated in the bill of exceptions, that the expediency or need of employing another physician was ever spoken of, or thought of by the witness, the patient, or any member of her family.

2. The evidence of the effect of sugar of lead water upon the hand and wrist of the witness ought not to have been admitted. The propriety of its application to the patient, and its effect upon her, were the proper and only material subjects of inquiry; and its effect upon another person free from the disease to which the patient was subjected, was quite irrelevant. Remedial agents may undoubtedly very often prove injurious if improperly used; and the more efficient they are, the more mischievous are likely to be the results of their misapplication.

3. The testimony that the husband plaintiff was an invalid, dependent for his support upon the labor of his wife, should have been excluded. The suggestion in the written argument of the plaintiff's counsel, that it was admissible, because the action was brought to recover damages for the loss of his wife's services, seems to be founded upon a misapprehension of what the allegations in the declaration are. It certainly does not appear from the bill of exceptions that the action is brought for the purpose stated.

4. The testimony of Miss Twombly respecting the time when she first heard of the punctured wound, was immaterial and ought not to have been received upon either of the grounds upon which it is claimed to have been admissible. It had no tendency to contradict any part of the reported testimony of Dr. Jenness; and it does not appear that the defendant, either before or after his attendance upon the patient, assigned this as the cause of the disease in her thumb.

The physicians who were witnesses upon the trial, expressed the opinion that a punctured wound was one of several causes, which might produce or result in a whitlow or felon; but no evidence was offered to show that the defendant did or did not entertain a similar opinion.

5. The interrogatory " Is it good medical practice to say you open a thumb to cut off a nerve because it is already partly cut off," should not, against objection, have been allowed to be put to the witness. The terms of the question certainly involve no medical act or practice whatever, but only a reason assigned for an act. It was so framed as to be likely to mislead the witness, and his reported reply shows that it did mislead him.

The physicians and surgeons should have been allowed to testify in reply to the several interrogatories proposed by the defendant, which were held by the presiding judge to be inadmissible.

1. Evidence having been introduced on the part of the plaintiffs that the defendant spoke of cutting off the nerve, when he made the incision into the patient's thumb, it was competent for him, in order to show the signification of the word, and to explain what he himself meant thereby, to prove that physicians and surgeons, in communicating with their patients, and other persons not professionally educated, use it to express either the *fascia* and *sheath* of a tendon, or the tendon itself. *Birch* v. *Depeyster*, 1 Stark. R. 210; 1 Greenl. Ev. § 280.

2. The only objection taken by the plaintiffs to the second question was, that the answer might tend to mislead the jury, because it was not pointed with sufficient directness to the case treated by the defendant. Yet, though not thus particular in its form, its object could not have been mistaken, and the general current of inquiry must have made it applicable to the matter immediately in issue. Besides; it would have been quite allowable to show in the first place what was the general rule, and then to add proof that the case treated by the defendant came within it. Upon the question whether it be good medical practice to withhold from a patient in a particular emergency, or under given or supposed circumstances,

a knowledge of the extent and danger of his disease, the testimony of educated and experienced medical practitioners is material and peculiarly appropriate.

3. The objection of the plaintiffs to the third and fifth ques tions that the opinions sought for were upon only a part of the case, ought not to have prevailed. The court could not foresee that the jury would not take the testimony of Lucinda P. Twombly to be true, to the exclusion of the statements of all other witnesses, if in fact there was any diversity of state ment in relation to the disease, the symptoms manifested, or the treatment prescribed by the defendant; and therefore he had a right to show that, assuming her whole narrative to be strictly accurate, his management of the case was skilful, judicious, and correct.

4. For a similar reason the defendant should have been per mitted to propose the remaining question, which is clearly within the rule respecting the admissibility of the opinion of experts. The replies of the medical witnesses would have been merely evidence to be considered, and thereupon allowed the effect to which they were justly entitled, and not, as is urged by the plaintiffs' counsel, a substitution of the theories of experts for the judgment of the jury. *New trial granted.*