IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,439

ALYSIA R. TILLMAN and STORM FLEETWOOD,
*Appellants*,

v.

KATHERINE A. GOODPASTURE, D.O.,
*Appellee.*

OFFICE OF ATTORNEY GENERAL DEREK SCHMIDT, *Intervenor*.

SYLLABUS BY THE COURT

1.

Determining whether a statute violates the Kansas Constitution is a question of law subject to unlimited review.

2.

Section 5 of the Kansas Constitution Bill of Rights declares, "The right of trial by jury shall be inviolate." It applies to give the right to trial by jury on issues of fact so tried at common law as it existed at the time the Kansas Constitution was adopted, but no further.

3.

K.S.A. 2020 Supp. 60-1906(a) does not violate section 5 of the Kansas Constitution Bill of Rights.

1

4.

Section 18 of the Kansas Constitution Bill of Rights guarantees for all persons, for injuries suffered in person, reputation, or property a "remedy by due course of law, and justice administered without delay." It does not create rights of action. It preserves the right to remedy by due process of law for civil causes of action recognized as justiciable by the common law as it existed at the time the Kansas Constitution was adopted.

5.

K.S.A. 2020 Supp. 60-1906(a) does not violate section 18 of the Kansas Constitution Bill of Rights.

Review of the judgment of the Court of Appeals in 56 Kan. App. 2d 65, 424 P.3d 540 (2018). Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed April 30, 2021. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Lynn R. Johnson*, of Shamberg, Johnson & Bergman, Chtd., of Kansas City, Missouri, argued the cause, and *David R. Morantz*, *Ashley E. Billam*, and *Paige L. McCreary*, of the same firm, and *Stanley R. Ausemus*, of Stanley R. Ausemus, Chartered, of Emporia, were with him on the briefs for appellants.

*Jacob E. Peterson*, of Clark, Mize & Linville, Chartered, of Salina, argued the cause, and *Dustin J. Denning*, of the same firm, was with him on the briefs for appellee.

*Brant M. Laue*, deputy solicitor general, argued the cause, and *Dwight R. Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, *Toby Crouse*, solicitor general, *Jeffrey A. Chanay*, chief deputy attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for intervenor.

The opinion of the court was delivered by

BILES, J.: This case considers the constitutional validity of a statute abolishing a medical malpractice claim commonly known as a "wrongful birth" action. See K.S.A. 2020 Supp. 60-1906(a) (abolishing the claim), (d)(2) (defining the claim). The plaintiff parents allege their prenatal doctor negligently failed to inform them about serious fetal abnormalities observable from an ultrasound that would have led them to terminate the pregnancy had they known. They sued to recover the costs of care after their child was born with severe, permanent disabilities. A district court dismissed their lawsuit based on the statute, and a Court of Appeals panel affirmed. See *Tillman v. Goodpasture*, 56 Kan. App. 2d 65, 424 P.3d 540 (2018). We granted review at the parents' request. They argue K.S.A. 2020 Supp. 60-1906(a) violates two constitutional protections—the right to trial by jury guaranteed by section 5 of the Kansas Constitution Bill of Rights, and the right to a remedy guaranteed by section 18 of the Kansas Constitution Bill of Rights. We affirm.

Thirty years ago, this court joined most of the other state courts that had considered the issue by confirming this cause of action was viable in Kansas. See *Arche v. United States*, 247 Kan. 276, 798 P.2d 477 (1990). Twenty-three years later, the Legislature enacted K.S.A. 2013 Supp. 60-1906, so the question now is whether a state law can abolish wrongful birth causes of action after our court acknowledged them. See L. 2013, ch. 48, § 1. We hold the statute is constitutional. Our resolution stems from a central conclusion that the *Arche* court recognized the wrongful birth tort as a new cause of action. As a result, section 5's jury trial right and section 18's right to a remedy—both of which extend under our caselaw only to common-law causes existing at the time these constitutional protections were adopted—do not shield the parents' claim from this legislative action.

FACTUAL AND PROCEDURAL BACKGROUND

Katherine A. Goodpasture, D.O., provided obstetrical prenatal medical care to Alysia R. Tillman beginning in November 2013. After an ultrasound in January 2014, Goodpasture reported a female fetus with normal anatomy. The petition alleges the ultrasound actually reflected severe structural deformities and brain defects. Goodpasture denies this.

About 16 weeks later, Tillman had another ultrasound. This time, Goodpasture reported an "irregularly shaped fluid-filled space in the brain" and noted "[u]ncertain diagnosis." An MRI the next day revealed schizencephaly, a developmental birth defect affecting the brain's cerebral hemisphere. A baby girl was born a few days later with severe and permanent neurological, cognitive, and physical impairments. Her condition is not medically correctable and will require a lifetime of medical treatment, attendant care, therapy, and other special needs.

The baby's parents, Tillman and Storm Fleetwood, sued Goodpasture, alleging the doctor breached the applicable duty of care by failing to detect the fetal abnormalities from the January 2014 ultrasound. They claim Tillman would have terminated her pregnancy had Goodpasture accurately reported the ultrasound results, and that the doctor's negligence deprived Tillman of her right to make an informed decision about her options.

Goodpasture moved for judgment on the pleadings, arguing the damages claim for future care made this a "wrongful birth" lawsuit barred by K.S.A. 2020 Supp. 60-1906(a), which declares,

4

"No civil action may be commenced in any court for a claim of . . . wrongful birth, and no damages may be recovered in any civil action for any physical condition of a minor that existed at the time of such minor's birth if the damages sought arise out of a claim that a person's action or omission contributed to such minor's mother not obtaining an abortion."

The parents countered by attacking the statute's validity, arguing it violated their rights to a jury trial and to a legal remedy under sections 5 and 18 of the Kansas Constitution Bill of Rights.

The attorney general intervened after receiving notice of the constitutional attack against the statute. See K.S.A. 75-764(a), (e) (allowing attorney general to intervene when statute's constitutionality is challenged), K.S.A. 2020 Supp. 60-224(b)(2)(C) (court must permit attorney general's intervention under K.S.A. 75-764). He argued the statute did not violate sections 5 or 18.

The district court granted judgment to Goodpasture based on the statute, which it determined was constitutional. The court held sections 5 and 18 protect only those civil actions existing at common law before the Kansas Constitution's adoption in 1859, and that wrongful birth claims were not recognized in Kansas until the *Arche* decision in 1990. It reasoned this cause of action was not "simply another form of negligence" because it requires proof of more elements to be actionable and limits recoverable damages from those that are typically available to successful tort plaintiffs. The court explained that "[a]lthough the tort of wrongful birth shares some characteristics with the tort of negligence, the proof required for and the policy behind wrongful birth are something wholly new and separate from simple negligence."

5

The parents appealed, and a Court of Appeals panel affirmed the district court. *Tillman*, 56 Kan. App. 2d at 66. The parents petitioned for review, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

STANDARD OF REVIEW

These constitutional issues arise from the district court's decision to grant Goodpasture judgment on the pleadings. Our standard of review when this happens is a familiar one.

> "'A motion for judgment on the pleadings under 60-212(c), filed by a defendant, is based upon the premise that the moving party is entitled to judgment on the face of the pleadings themselves and the basic question to be determined is whether, upon the admitted facts, the plaintiffs have stated a cause of action. The motion serves as a means of disposing of the case without a trial where the total result of the pleadings frame the issues in such manner that the disposition of the case is a matter of law on the facts alleged or admitted, leaving no real issue to be tried. The motion operates as an admission by movant of all fact allegations in the opposing party's pleadings.'

> "An appellate court's review of whether the district court properly granted a motion for judgment on the pleadings is unlimited. [Citations omitted.]" *Mashaney v. Bd. of Indigents' Def. Servs.*, 302 Kan. 625, 638-39, 355 P.3d 667 (2015).

Whether K.S.A. 2020 Supp. 60-1906(a) is invalid under either sections 5 or 18 of the Kansas Constitution Bill of Rights is an issue of law subject to unlimited appellate review. *Miller v. Johnson*, 295 Kan. 636, 646-47, 289 P.3d 1098 (2012), *abrogated in part on other grounds by Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 442 P.3d 509 (2019).

6

The outcome for both constitutional questions is driven by whether this so-called "wrongful birth" action should be considered a new cause of action as of 1990 when the *Arche* court confirmed its existence. We examine that first.

In wrongful birth actions, parents of a child born with a detectable birth defect allege they would have terminated the pregnancy but for the physician's negligent failure to inform them of the likelihood of that defect. The parents' injury results from their loss of the opportunity to make an informed decision about whether to proceed with the pregnancy. *Plowman v. Fort Madison Community Hospital*, 896 N.W.2d 393, 399 (Iowa 2017). As one court observed, any "wrongfulness" lies not in the birth, but in the physician's negligence. *Viccaro v. Milunsky*, 406 Mass. 777, 779 n.3, 551 N.E.2d 8 (1990).

The wrongful birth cause of action was presented to this court in 1990 as a matter of first impression. *Arche*, 247 Kan. 276. That case answered two certified questions from the United States District Court for the District of Kansas: (1) "Does Kansas law recognize a cause of action for the wrongful birth of a permanently handicapped child?" and (2) "If Kansas does recognize such a cause of action, what is the extent of damages which may be recovered upon proper proof?" 247 Kan. at 276.

In agreeing the cause of action could proceed based on then-existing Kansas law, and assuming the facts alleged were true at that early stage in the proceedings, the *Arche* court explained,

> "A plaintiff must prove three elements to prevail in a medical malpractice action
> in this state:  '(1) that a duty was owed by the physician to the patient; (2) that the duty

7

was breached; and (3) that a causal connection existed between the breached duty and the injury sustained by the patient.' *Wozniak v. Lipoff*, 242 Kan. 583, 587, 750 P.2d 971 (1988).

"Under Kansas law, if it were determined 'that the child would be born with physical or mental defect,' Nicole Arche could have chosen to have an abortion. K.S.A. 21-3407. *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, [35 L. Ed. 2d 147 (1973)], recognizes the right of a woman to have an abortion. We assume that plaintiff Nicole Arche was denied her right to make an informed decision whether or not to seek an abortion under facts which could and should have been disclosed. Under all of these circumstances, we hold that the action of wrongful birth is recognized in Kansas.

"In recognizing a cause of action for wrongful birth in this state, we assume that the child is severely and permanently handicapped. By handicapped, we mean, in this context, that the child has such gross deformities, not medically correctable, that the child will never be able to function as a normal human being. We further assume that there is negligence on the part of the defendants; that the gross defects of the child could have been determined by appropriate testing prior to birth; that defendants owed plaintiffs a duty to perform such tests; and that no such tests were offered or performed, or if performed, were negligently performed." *Arche*, 247 Kan. at 281.

The *Arche* court also held a successful plaintiff could recover expenses caused by the child's handicap for the child's life expectancy or until the child reached the age of majority. 247 Kan. at 283, 291. But it excluded from the recoverable damages calculation what would be considered the expected expenses for raising a child because "[w]rongful birth plaintiffs typically desire a child and plan to support the child." 247 Kan. at 282. Similarly, the *Arche* court excluded damages for emotional distress because typically "visibility of results as opposed to visibility of the tortious act does not give rise to a claim for emotional damages" under Kansas caselaw. 247 Kan. at 283. And since recoverable damages were limited in these ways, the court held no offset would be

8

allowed "against the damages caused by the defendant's negligence" for "any special benefits to the plaintiffs from having a child." 247 Kan. at 283.

Both lower courts in this case decided *Arche* recognized a "new" cause of action, as opposed to one at common law when the Kansas Constitution was adopted. For its part, the panel gave four reasons why it thought this was a "new" tort: (1) *Arche* added elements not otherwise typically required to prove medical malpractice; (2) the *Arche* court did not explicitly say wrongful birth was "a different application of the concept of negligence"; (3) the *Arche* majority did not expressly contradict the concurrence's characterizations of wrongful birth as a "new" tort; and (4) Kansas law in 1859 would have barred wrongful birth actions on public policy grounds. *Tillman*, 56 Kan. App. 2d at 73-74. In our view the panel overworked the constitutional analysis, although we agree with its outcome.

To begin with, what the *Arche* majority did not say about wrongful birth when describing its origins is no guiding light on the constitutional questions presented. It was rank speculation for the panel to conjure any analytical meaning just because "[t]he majority *could have corrected* [Justice Six's concurrence] and stated wrongful birth fit within the conceptual framework of negligence." (Emphasis added.) *Tillman*, 56 Kan. App. 2d at 74. Trying to find harmony in understanding from an appellate court majority's failure to engage in a back and forth with those writing separately invites folly. See Garner, et al., The Law of Judicial Precedent, p.191 (2016) ("A concurrence that addresses an issue explicitly put aside by the court presents little difficulty: you know the inclinations of as many judges as join the opinion.").

Similarly, it is unnecessary to base a decision in Tillman's case on a contention that these causes of action could not have existed when the Kansas Constitution was adopted because of territorial statutes touching on abortion. As we have explained, those

9

early statutes are susceptible to differing views and require a more detailed historical background than the panel allowed for in this regard. See *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 650-60, 440 P.3d 461 (2019) (discussing territorial and early state statutes criminalizing abortion).

That said, we find it far more persuasive simply to look at how the *Arche* court constructed the cause of action it was recognizing in response to the federal court's inquiries. And that reveals a tort with non-traditional elements required to bring the action, as well as non-traditional damages limitations for the prevailing plaintiffs' recovery. See *Arche*, 247 Kan. at 278 (distinguishing wrongful birth and wrongful life, noting "[t]here is no legal right not to be born, and allowing an action for being born would create a new tort, rather than applying established tort principles to technological advances"). These factors guide our ultimate conclusion.

At the outset of our analysis, one should quickly acknowledge some of what the *Arche* court described as its rationale in recognizing this cause of action is consistent with traditional tort principles. By definition, this action necessarily rests on a foundation of the basic tort of negligence—a breach of a duty owed resulting in injury caused by that breach. It permits patients to recover damages for injuries caused by their physicians' failure to meet the applicable standard of care in providing prenatal treatment. See 247 Kan. at 281 (assuming in recognizing cause of action that physician owed patient duty to perform prenatal tests but were negligent either in performing them or failing to perform them). Similarly, the injury recognized is the invasion of the mother's legally protected interest in making an informed decision whether to proceed with the pregnancy based on the medical circumstances. See 247 Kan. at 281 ("We assume that plaintiff . . . was denied her right to make an informed decision whether or not to seek an abortion under facts which could and should have been disclosed."). And the wrongful birth tort vindicates "'fundamental policies of tort law:  to compensate the victim; to deter

10

negligence; and to encourage due care.'" *Keel v. Banach*, 624 So. 2d 1022, 1031 (Ala. 1993) (quoting *Siemieniec v. Lutheran Gen. Hosp*, 117 Ill. 2d 230, 257-58, 512 N.E.2d 691 [1987], *overruled in part on other grounds by Clark v. Children's Mem'l Hosp.*, 955 N.E.2d 1065 [2011]).

But simply being consistent with basic traditional tort principles does not make wrongful birth a traditional tort. After all, minimal consistency is to be expected because "[m]ost 'new' torts . . . are developed from the common law fabric of general principles." Dobbs, Hayden & Bublick, The Law of Torts § 1, n.8 (2d ed. 2020); see also *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 203, 4 P.3d 1149 (2000) ("Whether to adopt or recognize a new cause of action falling within the common law of tort or negligence is a question of law over which we have unlimited review."); *Plowman*, 896 N.W.2d at 401 ("We considered three factors to decide whether to recognize the right to sue: [1] whether the action is consistent with traditional concepts of common law, [2] whether there are prevailing policy reasons against recognizing such a cause of action, and [3] whether Iowa statutes speak to the issue."). We must look more closely.

To begin, we first contrast a case in which a modern advance in tort law did *not* create a new tort: *Lemuz v. Fieser*, 261 Kan. 936, 933 P.2d 134 (1997). In *Lemuz*, a statute prohibited a cause of action against a health care facility alleging that facility negligently granted privileges to a doctor whose own negligence injured plaintiffs. When the plaintiffs argued that statute violated section 18, the facility argued it did not because the corporate negligence doctrine abolished by the statute did not exist at the time the Kansas Constitution was adopted. The *Lemuz* court disagreed, concluding "corporate negligence causes of action are not 'new' causes of action but are simply different applications of the basic concepts of negligence which existed at common law when the Kansas Constitution was adopted." 261 Kan. at 945.

11

To reach this conclusion, the *Lemuz* court noted corporate negligence is "based upon the basic principle of negligence, a common-law remedy which was recognized at the time the Kansas constitution was adopted." 261 Kan. at 945. It reasoned hospitals have an "independent duty to ensure the health and safety of their patients," including in their staffing decisions. 261 Kan. at 945. And the court reasoned "[o]nce this new duty for hospitals is plugged into an old cause of action, negligence, the hospital's liability under the corporate negligence doctrine develops." 261 Kan. at 945.

The parents here argue that, much like *Lemuz*, the wrongful birth action recognized in *Arche* is just a "common law medical negligence cause of action" that applies new technology and the right to terminate a pregnancy to the traditional elements of a negligence claim. We disagree.

Comparing the wrongful birth tort to the corporate negligence actions examined in *Lemuz* reveals meaningful differences—namely, that the wrongful birth tort's recognition required tailor-made rules for both liability and damages. And unlike the development of corporate negligence actions discussed in *Lemuz*, *Arche* did not result simply from "plugg[ing]" a newly recognized duty of care "into an old cause of action." *Lemuz*, 261 Kan. at 945. *Arche* started with the preexisting duty of care a doctor owes any patient, but then set restrictive conditions for when a breach of that duty would be actionable, and then further narrowed the traditional recovery principles for successful plaintiffs.

The *Arche* court restricted actions for the invasion of the "right to make an informed decision whether or not to seek an abortion" to only those circumstances when the child is "severely and permanently handicapped"—meaning a child born with "such gross deformities, not medically correctable, that the child will never be able to function as a normal human being." *Arche*, 247 Kan. at 281. In other words, the *Arche* court established unique limiting circumstances for this cause of action not typically seen in

12

medical malpractice actions by distinguishing this cause from claims that might have been based on less severe birth defects or even undesirable physical traits detectable within the same applicable standard of care.

And in keeping with that threshold distinction, the *Arche* court further acknowledged that a claim concerned with such a distinguishable severe injury could not simply apply traditional measures of damage for its remedy. As the court noted, "formulas for damages in wrongful birth cases vary widely." 247 Kan. at 281. This is something the Illinois Supreme Court acknowledged, explaining:

> "While the jurisdictions that have reached the merits of the wrongful birth controversy are almost unanimous in their recognition of the cause of action, *they are not in agreement on how to assess damages. The complex legal, moral, philosophical, and social issues raised by wrongful birth claims have resulted in a widely divergent judicial treatment of damages*." (Emphasis added.) *Siemieniec*, 117 Ill. 2d at 258.

So while the wrongful birth tort in Kansas can find roots in traditional tort principles to a point, it is much more than just "[a] different application[ ] of the basic concepts of negligence which existed at common law . . . ." *Lemuz*, 261 Kan. at 945. The same is true for the recoverable damages.

We have previously noted in personal injury cases, the baseline for damages along these lines:

> "Under the common law, the purpose of awarding damages is to make a party whole by restoring that party to the position he was in prior to the injury. Damages to restore a person to his prior position are divided into economic and noneconomic damages. Economic damages include the cost of medical care, past and future, and related benefits, *i.e.*, lost wages, loss of earning capacity, and other such losses. Noneconomic losses

13

include claims for pain and suffering, mental anguish, injury and disfigurement not affecting earning capacity, and losses which cannot be easily expressed in dollars and cents. [Citations omitted.]" *Samsel v. Wheeler Transp. Servs., Inc.*, 246 Kan. 336, 352-53, 789 P.2d 541 (1990), *disapproved of on other grounds by Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), and *abrogated on other grounds by Miller*, 295 Kan. 636.

But these traditional principles noticeably vary with the wrongful birth action, which the *Arche* court defined as one in which parents "claim they would have avoided conception or terminated the pregnancy had they been properly advised of the risks or existence of birth defects to the potential child." *Arche*, 247 Kan. at 278. And from this, the court reasoned recoverable damages necessarily had to be adjusted to cover only the expenses caused by the child's handicap—even though the cause of action assumes the child would not have even been born but for the doctor's negligence. The *Arche* court held the usual child rearing costs would not be allowed because "[w]rongful birth plaintiffs typically desire a child and plan to support the child." 247 Kan. at 282. So despite the fact that this wrongful birth claim is premised on the argument that plaintiffs would not have become parents at all but for the physician's negligence, the *Arche* court determined "[i]t is . . . reasonable to deny those normal and foreseeable costs which accrue to all parents." 247 Kan. at 282.

And the *Arche* court further concluded plaintiffs in these cases could not recover damages for emotional distress "suffered as the consequence of witnessing the birth of an impaired child and the consequent stress of raising such a child." 247 Kan. at 283. It reasoned, "The rule in Kansas is that plaintiffs can sustain a cause of action for negligent infliction of emotional distress caused by the injuries of a third party only if they were witnesses to the occurrence which caused the injury." 247 Kan. at 283. This again distinguishes a wrongful birth tort from typical medical malpractice actions involving personal injury because in the wrongful birth action not all noneconomic losses caused by

14

the injury are recoverable. See *Miller*, 295 Kan. 636, Syl. ¶ 3 ("Section 18 of the Kansas Constitution Bill of Rights provides an injured party a constitutional right to be made whole and a right to damages for economic and noneconomic losses.").

The point here is simply that wrongful birth actions may sound in medical malpractice because they are premised on a physician's negligent breach of a duty owed to a patient, but the comparative differences mean something when trying to decide where wrongful birth as a tort fits on the common-law continuum. And the conclusion seems obvious that the *Arche* court really created a new legal wrong that required a measure of damages tailored to its unique circumstances.

We also note the wrongful birth tort is not the only modern common-law innovation in the medical malpractice field. For example, in *Delaney v. Cade*, 255 Kan. 199, 873 P.2d 175 (1994), the court recognized a cause of action sounding in negligence to recover damages when

> "the patient is suffering a preexisting injury or illness which is aggravated by the alleged negligence of the doctor or health care provider to the extent that the patient dies, when without negligence there might have been a substantial chance of survival or the actual recovery is substantially less than it might have been absent the alleged malpractice." 255 Kan. at 203.

In doing so, the *Delaney* court acknowledged it had to "adopt[] a standard of causation which departs from the traditional standard applied in negligence cases," because "the theory comes into play when the traditional probability standard of causation is not met." 255 Kan. at 203-04. The wrongful birth cause of action is not much different.

15

A final observation highlights why we are persuaded the *Arche* court's recognition of the wrongful birth tort in 1990 broke new ground. K.S.A. 60-1906 could have been enacted *before* the *Arche* decision without offending our Constitution. This is because the cause of action had not been previously found to exist in Kansas. See *KPERS v. Reimer & Koger Associates, Inc.*, 261 Kan. 17, 35, 927 P.2d 466 (1996) (rejecting constitutional challenge to a statute because it cut off one tortfeasor's common-law right to contribution from a joint tortfeasor because "there never has been a common-law right of contribution for joint tortfeasors in Kansas," and so "[t]he legislature may abolish the remedy without any restrictions imposed by the Kansas Constitution since such right did not exist at common law at the time Kansas adopted its constitution in 1861"). And this observation from the *KPERS* decision is consistent with courts in two other jurisdictions that rejected challenges under their state constitutions' open courts, due process, and right-to-remedy provisions because the wrongful birth cause of action did not exist absent a prior court decision recognizing it. See *Wood v. Univ. of Utah Med. Ctr.*, 67 P.3d 436, 443 (Utah 2002); *Hickman v. Group Health Plan, Inc.*, 396 N.W.2d 10, 13, 15 (Minn. 1986) (noting "[a]t common law, no cause of action existed for either wrongful birth or wrongful death").

In summary, we hold the wrongful birth action is not among the traditional common-law causes of action, even though it has aspects consistent with traditional negligence principles. The recognition of a new injury; the adoption of factual requirements for that injury to be actionable; and the formulation of rules limiting recoverable damages specific to the injury combine to cause us to conclude wrongful birth was a "new" tort created in 1990, rather than simply being a different application of the basic concepts of negligence existing at common law solely within the *Lemuz* court's meaning.

16

We must now apply this conclusion to the constitutional challenges advanced by the parents.

*Section 5*

Section 5 of the Kansas Constitution Bill of Rights provides that "[t]he right of trial by jury shall be inviolate." This jury trial right is guaranteed in cases properly triable by jury before the adoption of the Constitution. "In chancery and statutory proceedings the legislature has the power to dispense with trial by jury." *Swarz v. Ramala*, 63 Kan. 633, Syl. ¶ 3, 66 P. 649 (1901).

> "[T]here are two basic questions in any Section 5 analysis: In *what types of cases is a party entitled to a jury trial as a matter of right*? See, *e.g.*, *Hasty v. Pierpont*, 146 Kan. 517, 72 P.2d 69 (1937) (distinguishing causes at law from causes in equity); see also *City of Fort Scott v. Arbuckle*, 165 Kan. 374, 388-89, 196 P.2d 217 (1948) (distinguishing prosecutions for violation of municipal ordinances and state statutes). And when such a right exists, what does the right protect? See, *e.g.*, *Miller*, 295 Kan. at 647-48 (analyzing jury's role in determining damages); *Kimball v. Connor*, 3 Kan. 414, 432 (1866) ('[Section 5] . . . does [not] contemplate that every issue, which, by the laws in force at the adoption of the constitution of the State, was triable by jury . . . should remain irrevocably triable by that tribunal.').
>
> "In answering the second question, this court has consistently noted that when the Section 5 jury trial right is implicated, '"[i]t applies no further than to give the right of such trial *upon issues of fact so tried at common law* and does not affect the pleading stage of the case."' (Emphasis added.) [Citation omitted.]" (Emphasis added.) *State v. Love*, 305 Kan. 716, 735, 387 P.3d 820 (2017).

The Court of Appeals resolved the section 5 claim by concluding wrongful birth is a new tort and therefore not subject to section 5 protection. See *Tillman*, 56 Kan. App. 2d

17

at 75 ("We hold Section 5 only applies to those causes of action recognized in 1859. Section 5 is not implicated in this case, and the Legislature was within its power to enact K.S.A. 2013 Supp. 60-1906 because there was no right available under the common law for a wrongful birth action in 1859."). Before this court, the parents advance two arguments to counter the panel. First, they assert their claim is a traditional tort capable of remedy under common law when our Constitution was adopted. Second, their claim is protected by section 5 simply because it seeks monetary damages, which makes it an action at law even if it is characterized as a "new" tort. Neither theory carries the day.

The first fails for the reasons just explained about the tort's origin, so we agree with the panel that the wrongful birth tort was recognized as a new cause of action in 1990. "Our court has consistently held that Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence." *Miller*, 295 Kan. at 647. Similarly, in *Leiker ex rel. Leiker v. Gafford*, 245 Kan. 325, 361-62, 778 P.2d 823 (1989), the court held a statutory cap on noneconomic damages in wrongful death cases did not violate section 5 because "Kansas common law did not recognize a civil claim for wrongful death at the time our Bill of Rights was adopted." Our conclusion that the wrongful birth tort was adopted as a new cause of action precludes the argument that statutorily abrogating the cause of action through K.S.A. 2020 Supp. 60-1906(a) abridged the parents' section 5 rights.

The second theory fails because the fact that an action seeks money damages does not by itself determine whether section 5 rights attach. Instead, the litmus test is the character of the cause of action. See *Smith v. Printup*, 254 Kan. 315, 866 P.2d 985 (1993) (addressing whether section 5 guaranteed right to have jury determine punitive damages); *Leiker*, 245 Kan. 325 (considering whether section 5 protected measure of damages in wrongful death actions). For example, section 5 rights do not apply to wrongful death actions, even though they seek compensatory money damages that parallel those awarded

18

and subject to section 5 protection in traditional common-law personal injury actions. Compare K.S.A. 60-1904(a) (setting out elements of damage in wrongful death claims) and *Leiker*, 245 Kan. 325, with *Miller,* 295 Kan. at 647 ("The parties correctly do not dispute that common-law tort actions, including medical malpractice claims, were historically triable to a jury. . . . There is also correctly no dispute that the amount of damages, including noneconomic damages, was a question of fact determined by the jury in common-law tort actions.").

And in *Smith*, the court held section 5 does not guarantee a right to have a jury determine punitive damages, even though juries performed that determination for compensatory damages at common law. It noted "the availability of damages distinguishes the suit at law from one in equity, and suits at law were tried to a jury at common law," and then concluded this "does not require a jury determination of the amount of punitive damages." *Smith*, 254 Kan. at 324. Instead, the court continued it "must look to the character of the claim to determine whether it is one for which a right to trial by jury exists." 254 Kan. at 324. It then reasoned that although "[c]ompensatory damages fall into the category of a remedy at common law[,] . . . punitive damages were not considered a remedy at common law, but merely incident to those causes of action in tort requesting compensatory damages." 254 Kan. at 325.

Since the parents' claim for damages is based on a cause of action newly adopted in 1990 as a part of this court's continuing common-law development, the Legislature's later abrogation of that cause of action does not implicate their section 5 rights. We hold K.S.A. 2020 Supp. 60-1906 does not offend section 5.

19

*Section 18*

As with section 5, our conclusion that wrongful birth was recognized as a new cause of action in 1990 forecloses the parents' claim that section 18 precludes the Legislature from statutorily abrogating the cause of action.

Section 18 provides, "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." Kan. Const. Bill of Rights, § 18. Section 18 "does not create rights of action; it means only that 'for such wrongs that are recognized by the law of the land,' the courts of this state shall be open and afford a remedy." *Schmeck v. City of Shawnee*, 231 Kan. 588, 594, 647 P.2d 1263 (1982) (holding section 18 did not require court to recognize cause of action for emotional and physical injury when they did not result from actionable negligence).

K.S.A. 2020 Supp. 60-1906 declares wrongful birth, though recognized as an actionable common-law wrong in *Arche*, is no longer a wrong recognized by the law of the land. Our question then is whether section 18 constrains the Legislature's authority to countermand statutorily *Arche*'s recognition of this new tort. In the plaintiffs' view, section 18's constraint applies to all judicially recognized causes of action regardless of timing. Again, we disagree.

Generally, the Legislature is empowered to modify the common law.

"From the earliest days of Kansas history, flexibility in the common law has been carefully preserved. Indeed, the great office of statutes is to remedy defects in the common law as they are developed and to adapt it to the changes of time and circumstances. That the legislature may change the principle of the common law and

20

abrogate decisions made thereunder when in its opinion it is necessary to the public interest is well settled. [Citations omitted.]" *Williams v. City of Wichita*, 190 Kan. 317, 331, 374 P.2d 578 (1962).

But under our present caselaw, section 18 curtails that flexibility for claims that existed at common law when our Constitution was adopted. In those instances, the contours of this curtailment are far-reaching: "'The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished.'" *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 855, 942 P.2d 591 (1997); see also *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 346-47, 350, 757 P.2d 251 (1988) (noting without citation that "as with Section 5, the court looks to insure that due process requirements are met and, when a common-law remedy is modified or abolished, an adequate substitute remedy must be provided to replace it"), *overruled in part on other grounds Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991).

Section 18, however, does not extend that protection for statutory changes to common-law causes of action recognized after our Constitution's adoption. "[T]he provisions of § 18 preserve the right to remedy by due course of law 'only as to civil causes of action that were recognized as justiciable by the common law as it existed at the time our constitution was adopted.'" *Lemuz*, 261 Kan. at 944. As explained earlier, wrongful birth tort fit later in time on the common-law continuum.

Given our earlier conclusion about this tort's origins, we reject the parents' contention that their section 18 issue is controlled by *Lemuz*' exception for claims that are "simply different applications of" traditional torts. 261 Kan. at 945. We hold the Legislature was free to abrogate *Arche* by statute without implicating section 18 under the circumstances presented.

21

To reiterate, the wrongful birth cause of action is not just a different application of the traditional medical malpractice tort, it is a new species of malpractice action first recognized in 1990. Moreover, K.S.A. 2020 Supp. 60-1906 is appropriately applied to the parents because it was enacted before their cause of action accrued under the *Arche* rule. See *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974) ("There is a plethora of authority that '[N]o person has a vested interest in any rule of law, entitling him to insist that it shall remain unchanged for his benefit.' Accordingly, a 'citizen may find that events occurring after passage of such a statute place him in a different position legally from that which he would have occupied had they occurred before passage of the statute.'").

The district court properly applied K.S.A. 2020 Supp. 60-1906(a) to conclude the doctor was entitled to judgment on the pleadings.

Affirmed.

BEIER, J., not participating.
MICHAEL E. WARD, Senior Judge, assigned.[1]

* * *

STEGALL, J., concurring in part and dissenting in part: This case should be resolved by overruling one of the worst decisions in our court's history—*Arche v. United*

---

[1]**REPORTER'S NOTE:** Senior Judge Ward was appointed to hear case No. 117,439 vice Justice Beier under the authority vested in the Supreme Court by K.S.A. 20-2616.

22

*States*, 247 Kan. 276, 798 P.2d 477 (1990)—and that is what I would do. Even though *Arche* is no longer good law, it sits, *Korematsu*-like, as an ugly and as-yet unrepudiated black mark in our jurisprudential past. See *Korematsu v. United States*, 323 U.S. 214, 242, 65 S. Ct. 193, 89 L. Ed. 194 (1944) (Murphy, J., dissenting) (described by Justice Murphy in dissent as the "legalization of racism" and an "utterly revolting" display of discrimination that has no place "among a free people who have embraced the principles set forth in the Constitution of the United States").

*Arche* deserves the same treatment the United States Supreme Court recently gave *Korematsu* in *Trump v. Hawaii*, 585 U.S. ___, 138 S. Ct. 2392, 2423, 201 L. Ed. 2d 775 (2018), when that Court declared that even though *Korematsu* "has been overruled in the court of history" the Court would "make express what is already obvious: *Korematsu* was gravely wrong the day it was decided." The whole Court agreed, with the dissenters adding that "formal repudiation" of such "shameful precedent is laudable and long overdue." 138 S. Ct. at 2448 (Sotomayor, J., dissenting).

Like *Korematsu*, *Arche* legalized an "utterly revolting" form of discrimination that has no place among the free people of Kansas who have embraced principles of equal dignity and respect under the law for all persons—regardless of their abilities or disabilities. *Arche* recognized a theory of negligence that would allow a woman to recover damages against health care providers when she alleges she would have had an abortion if she had been told of a physical trait or condition she found undesirable in her unborn child. Thus, as described by the majority, *Arche* established the "loss of the opportunity" to abort a child with undesirable traits as a cognizable injury under Kansas law. See slip op. at 7.

To be crystal clear, my disagreement with *Arche* (as explained below) is *not* because the *Arche* holding was occasioned by the existence of a woman's right to

23

terminate her pregnancy—a right that would remain even were *Arche* overruled. Rather, my disagreement is grounded in the fact that *Arche* clearly and explicitly discriminates between "disabled" and "normal" unborn children. The discriminatory foundation of *Arche* is, in my considered judgment, undeniable, unacceptable, and wholly independent of the controversies and disagreements surrounding abortion.

So how did *Arche* arrive at its discriminatory rule? To begin, the *Arche* court clearly understood the problem with a general legal rule making the lost opportunity to abort a compensable loss. What if the mother had wanted a boy rather than a girl? What if she did not want a child with Down's syndrome? See *Grubbs v. Barbourville Family Health Etc.*, 120 S.W.3d 682, 690 (Ky. 2003) ("'When will parents be allowed to decide that their child is so "defective" that given a chance they would have aborted it while still a fetus and, as a result, then be allowed to hold their physician civilly liable? [Is it] [w]hen the fetus is only the carrier of a deleterious gene and not itself impaired . . . [or] [w]hen the fetus is of one sex rather than the other?'").

Who gets to decide which traits count as undesirable *enough* for the law to recognize the lost chance to abort as a true injury? See *Taylor v. Kurapati*, 236 Mich. App. 315, 349-50, 600 N.W.2d 670 (1999); Whitney & Rosenbaum, *Recovery of Damages for Wrongful Birth*, 32 J. Legal Med. 167, 171 (2011) ("No reported decision has taken up the question of whether a minor genetic defect or the gender status of the fetus could give rise to a wrongful birth action. As noted by one court [which rejected the wrongful birth cause of action], wrongful birth actions for minor genetic differences or characteristics [such as genes predisposing the conceived fetus to hypertension, diabetes, breast cancer, or other diseases or conditions] 'could slide quickly into applied eugenics' where the genetically 'unfit' are subject to termination.").

24

This becomes a serious problem because the overwhelming majority of courts have recognized that the birth of a healthy child can *never* be an "injury" compensable at law. Our court has held exactly this. In *Byrd v. Wesley Medical Center*, 237 Kan. 215, Syl. ¶ 2, 225, 699 P.2d 459 (1985), we explained that under "the public policy of this state, a parent cannot be said to be damaged by the birth of a normal, healthy child. . . . As a matter of public policy, the birth of a normal and healthy child does not constitute a legal harm for which damages are recoverable." We concluded that while the "birth of a normal, healthy child may be one of the consequences of a negligently performed sterilization," it nevertheless cannot be "a legal wrong for which damages should or may be awarded." 237 Kan. at 225.

Similarly, our sister courts have shown reluctance to permit recovery for the birth of a healthy child. See, e.g., *Andrews v. Keltz*, 15 Misc. 3d 940, 945, 838 N.Y.S.2d 363 (Sup. Ct. 2007) ("[T]he courts of New York determined that the birth of a healthy child is not a cognizable injury."); *Szekeres by Szekeres v. Robinson*, 102 Nev. 93, 97, 715 P.2d 1076 (1986) ("[R]efus[ing] to recognize the birth of a normal, healthy child as a compensable wrong.").

So the "lost opportunity" to abort a healthy child has no legal value as a matter of law. Put starkly, the lost opportunity to abort a baby girl because the plaintiff wanted a boy is not an "injury" the law will recognize. This is and ought to be axiomatic in our legal tradition.

To remedy this obvious problem, the *Arche* court embedded a reprehensible discrimination in Kansas law. According to *Arche*, only the lost opportunity to abort children with "gross deformities" who will "never be able to function as a normal human being" is valuable and compensable at law. *Arche*, 247 Kan. at 281. In an era that has rightly become hypersensitive to the way society has and continues to devalue certain

lives, these words should sound in our ears with shock and disgust. See, e.g., *Taylor*, 236 Mich. App. at 353 (questioning Michigan's wrongful birth tort and musing: "To our ears, at the close of the twentieth century, this talk of the 'unfit' and of 'defectives' has a decidedly jarring ring; we are, after all, above such lethal nonsense. But are we?").

*Arche* stands squarely against societal progress to recognize that marginalized, disenfranchised, and voiceless lives matter just as much as "normal" lives do.

> "Disabled people have a history of being marginalized and devalued in society. [Wrongful birth suits] . . . draw[] a distinction between healthy children and genetically disabled children [and] this furthers the marginalization and devaluation. . . . The state's endorsement of this disability hierarchy is a form of discrimination and results in eugenics." Stein, *Backdoor Eugenics:  The Troubling Implications of Certain Damages Awards in Wrongful Birth and Wrongful Life Claims*, 40 Seton Hall L. Rev. 1117, 1146-47 (2010).

In *Arche*, the Kansas Supreme Court said quite loudly that under Kansas law, some lives are worth more than others. And worse, that the lost opportunity to end some lives is actually worth money in a civil lawsuit. I cannot let such precedent—even precedent that has become a dead letter—stand without expressing in the strongest possible terms my condemnation of it. I need not belabor the point. We should today make express what is already obvious—*Arche* was gravely wrong the day it was decided. It should be given the *Korematsu* treatment by this court so that we can formally repudiate this shameful precedent.

Finally, while overruling *Arche* would end this case, the majority has chosen a different analytical path. I will offer a few passing remarks on its chosen course. In my view, the so-called tort of "wrongful birth" is not a "new" cause of action. On this question, I agree with the dissents of Chief Justice Luckert and Justice Rosen. Indeed, the

basic elements of the tort alleged by the plaintiffs are no different than any run-of-the-mill negligence action recognized at common law long before Kansas was a gleam in the American republic's eye. Those elements are traditionally stated as duty, breach, causation, and injury. *McCormick v. Board of County Commissioners*, 272 Kan. 627, 648, 35 P.3d 815 (2001).

This court has criticized the trend in modern tort law to divvy up tort "causes of action" into numerous named sub-categories. For example, we recently held that "negligent training" and "negligent supervision" are not separate torts but are merely factually distinct versions of an ordinary negligence claim. *Reardon v. King*, 310 Kan. 897, 906-07, 452 P.3d 849 (2019). Moreover, we admonished that to "the extent our prior caselaw contributed to this confusion" with the practice of naming different causes of action, "we make the conscientious decision today to move away from such characterizations of the anatomy of a negligence claim in Kansas." 310 Kan. at 907.

But today's majority reverts to the bad habit of trying to parse different negligence causes of action based on their facts. This will have the unfortunate side-effect of stepping back from the progress we have made in insisting that insofar as the common law is concerned, there is really only one cause of action for negligence. And while I have explained above why I would not permit recovery in "wrongful birth" cases, failing to state a claim under an existing cause of action is not the same thing as having no cause of action at all. Put differently, overruling *Arche* does not take away a cause of action, it simply means a plaintiff cannot state a claim for negligence based on the lost opportunity to take a life.

What distinguishes negligence claims from one another—in addition to the infinite variety of facts presented—is the variety of legal rules applicable to establishing and proving up the four traditional elements. Sometimes the law says the defendant did not

actually have the duty plaintiff alleges. *Bland v. Scott*, 279 Kan. 962, 973, 112 P.3d 941 (2005) ("Kansas did not recognize a common-law duty owed by suppliers of alcohol to third persons injured by an intoxicated person."). Sometimes the law says the kind of injury the plaintiff claims is not recoverable. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 50, 169 P.3d 1052 (2007) (plaintiff cannot state a claim for negligent infliction of emotional distress absent a showing of "immediate physical injury directly and proximately caused by the negligent conduct"). Sometimes the law says the causal connection between breach and harm is too remote. *Hale v. Brown*, 287 Kan. 320, 324, 197 P.3d 438 (2008) (holding a driver was not the proximate cause of injury because of the "the length of time between the first and second accidents and [an] intervening negligent act" by another driver). Sometimes the law takes away an affirmative defense previously available. *Simmons v. Porter*, 298 Kan. 299, 313-14, 312 P.3d 345 (2013) (holding the court was "clearly convinced preserving assumption of risk as a complete bar to recovery is no longer sound and should be of no practical effect given the statutory scheme of comparative fault"). Sometimes the law requires a different quantum or type of proof to establish an element. See K.S.A. 2014 Supp. 60-456(b) (adopting the *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 [1993], standard for expert testimony and aligning Kansas statute with Fed. R. Evid. 702).

These legal rules are susceptible to change—and they do change over time. But each time one changes it does not create a "new" cause of action. See *Lemuz v. Fieser*, 261 Kan. 936, 945, 933 P.2d 134 (1997) (explaining that recognizing a new duty does not alter the traditional elements of a negligence cause of action). The majority's attempt to distinguish *Lemuz* is unpersuasive. The fact that *Arche* set out a new legal rule on an element other than duty (by defining the legally cognizable injury) does not make it any different in principle from *Lemuz*.

But all of this begs the question—why does it matter? It matters because our interpretation of section 18 of the Kansas Constitution Bill of Rights has frozen the common law rules governing recovery in tort "in a common-law time warp." *Samsel v. Wheeler Transp. Servs., Inc.*, 246 Kan. 336, 363, 789 P.2d 541 (1990) (McFarland, J., concurring). But the common law, by its very nature, was never meant to be fossilized in constitutional sediment. To do so forces such rules to carry a weight they were not designed to bear. The genius of the common law was and remains its flexibility—over time—to adapt and adjust as it is applied to new cases, new circumstances, and new times. Brown, *Rethinking People v. Croswell: Alexander Hamilton and the Nature and Scope of "Common Law" in the Early Republic*, 32 Law & Hist. Rev. 611, 645 (2014) ("Hamilton deeply respected common-law legal traditions—particularly those concerning common-law rights—he simultaneously demonstrated how the common law could be flexible, vast, and capable of adapting to American policy ends when used strategically in court."); Balganesh, *The Pragmatic Incrementalism of Common Law Intellectual Property*, 63 Vand. L. Rev. 1543, 1574 (2010) ("Tort theorist Leon Green described this best when he noted that common law tort concepts are 'exceedingly flexible, capable of accommodating many shades of meaning,' representing 'not a language of precision but rather one of ambiguity . . . always requiring the judgment of some one [sic] to make it explicit.' Common law concepts thus derive their content from the way courts and litigants invoke them and instantiate them with particular meaning, as necessitated by the context."); Green, *Repressing Erie's Myth*, 96 Cal. L. Rev. 595, 651 (2008) ("Justice Thomas's dissenting opinion [joined by Scalia and Alito] endorsed a broader view of common-law crimes. '[T]he common law of war . . . ,as with the common law generally, . . . is flexible and evolutionary in nature, building upon the experience of the past and taking account of the exigencies of the present.'"); Partnoy, *Synthetic Common Law*, 53 U. Kan. L. Rev. 281, 297 (2005) ("Thus, a key advantage to a common law approach is that judicial rules evolve slowly as a flexible response to the actions and preferences of individuals and institutions involved in disputes."); Hathaway, *Path Dependence in the*

*Law: The Course and Pattern of Legal Change in a Common Law System*, 86 Iowa L. Rev. 601, 635 (2001) ("The Supreme Court has written that the 'flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law' and that 'the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions.'"); Stewart, *Panel I: Liberty, Property, and Environmental Ethics*, 21 Ecology L.Q. 411, 412 (1994) ("[T]he common law is decentralized, flexible, adaptive, and respectful of private ordering.").

My colleagues on this court now and in the past understand the vital necessity of this flexibility when it comes to matters traditionally occupied by the common law. Hence, the elaborate tests we use to decide when a rule-change counts as "new." And if we conclude it is not new, we have adopted a "quid pro quo" test (found nowhere in the text of section 18) to decide when it is permissible for either courts or the Legislature to change the rule anyway. All these twists and turns are designed to crack these common law legal rules out of their amber tomb in section 18 and free them to grow and adapt to changing circumstances and values.

I have previously criticized this jurisprudence. See *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1150-62, 442 P.3d 509 (2019) (Stegall, J., concurring in part and concurring in judgment). So I will not extend the discussion. It will suffice here to note that I would do away entirely with the judicially created amber tomb that section 18 has become. Instead, I would adopt an understanding of section 18 consistent with what we have said in the past: "[Section 18] does not create rights of action; it means only that 'for such wrongs that are recognized by the law of the land,' the courts of this state shall be open and afford a remedy." *Schmeck v. City of Shawnee*, 231 Kan. 588, 594, 647 P.2d 1263 (1982); see also *Clements v. U.S. Fidelity and Guarantee Co., Inc.*, 243 Kan. 124, 128, 753 P.2d 1274 (1988) ("[W]e have held that Section 18 does not create rights of action; it

only requires that Kansas courts be open and afford a remedy for such wrongs that are recognized by law.").

For these reasons, I concur in part and dissent in part.

* * *

LUCKERT, C.J., dissenting:  In my view, K.S.A. 2020 Supp. 60-1906 is unconstitutional under the test traditionally applied by this court to determine whether a statute violates section 5 of the Kansas Constitution Bill of Rights. I would therefore reverse the judgment of the district court and of the Court of Appeals. See *Tillman v. Goodpasture*, 56 Kan. App. 2d 65, 424 P.3d 540 (2018).

The majority succinctly describes the traditional test under section 5:  "Section 5 of the Kansas Constitution Bill of Rights declares, 'The right of trial by jury shall be inviolate.' It applies to give the right to trial by jury on issues of fact so tried at common law, but no further." Slip op., Syl. ¶ 2. And as the opening sentence of the majority opinion states, K.S.A. 2020 Supp. 60-1906 has the effect of "abolishing a medical malpractice claim commonly known as a 'wrongful birth' action." Slip op. at 2. From there, the majority excises one medical malpractice theory from other medical malpractice theories and concludes a wrongful birth action is a separate cause of action not known at common law and therefore not within the protection of section 5 of the Kansas Constitution Bill of Rights. Slip op. at 16-19. I disagree.

All medical malpractice cases have four elements:  (1) the medical professional owes the patient a duty of care; (2) the person breached this duty; (3) the patient was injured; and (4) the breach of the duty proximately caused the injury. *Puckett v. Mt. Carmel Regional Medical Center*, 290 Kan. 406, 420, 228 P.3d 1048 (2010). The exact

31

nature of the duty and the mechanism of a breach may vary case to case. In some medical malpractice cases, a plaintiff alleges a physician performs a medical procedure, such as reading a sonogram, in a negligent manner. Medical malpractice plaintiffs might also allege the physician was negligent in providing advice and counseling about the procedure, risks, and alternatives; these plaintiffs bring what is often called an informed consent claim. See *Johnston v. Elkins*, 241 Kan. 407, 736 P.2d 935 (1987); see also Black's Law Dictionary 380 (11th ed. 2019) (generally defining informed consent as "full knowledge of the risks involved and the alternatives"). Simply put, Alysia R. Tillman and Storm Fleetwood allege a physician owed them both duties—to perform within the physician's standard of care when reading the sonogram and in providing them full knowledge of a risk and the alternatives. And they also allege that Dr. Goodpasture breached both duties. They bring a classic medical malpractice action.

This court recognized as much when it cited the elements of medical malpractice in *Arche v. United States*, 247 Kan. 276, 281, 798 P.2d 477 (1990), the first Kansas case discussing a so-called wrongful birth action. After citing the elements, the court stated: "We assume that plaintiff Nicole Arche was denied her right to make an informed decision whether or not to seek an abortion under facts which could and should have been disclosed. Under all of these circumstances, we hold that the action of wrongful birth is recognized in Kansas." Given this context, I read *Arche* as recognizing that a wrongful birth action is one form of medical malpractice action.

*Johnston*, 241 Kan. 407, underscores this reading. There, a husband and wife sought damages from a physician who allegedly committed negligence in performing an unsuccessful vasectomy, failing to adequately test for sperm after the surgery, failing to inform the couple of testing options, and falsely informing the husband he was sterile. After the birth of the couple's fifth child, they sued the husband's physician and sought damages for their physical and emotional stress, health care expenses, and pain and

32

suffering associated with pregnancy and childbirth. The court noted that the action could be characterized as a wrongful birth, wrongful conception, or wrongful pregnancy action. But, after discussing the court's previous cases using those terms, it concluded that it "prefer[red] to characterize the action as one for medical negligence in the performance of surgery and in post-operative care and advice." 241 Kan. at 410.

Many other courts have also concluded that so-called wrongful birth cases are medical malpractice actions. See, e.g., *Robak v. United States*, 658 F.2d 471, 476 (7th Cir. 1981); *Phillips v. United States*, 508 F. Supp. 544, 550 (D.S.C. 1981); *Keel v. Banach*, 624 So. 2d 1022, 1026-28 (Ala. 1993); *Lininger v. Eisenbaum*, 764 P.2d 1202, 1205-08 (Colo. 1988); *Garrison v. Medical Ctr. of Del.*, 581 A.2d 288, 290 (Del. 1989); *Goldberg v. Ruskin*, 128 Ill. App. 3d 1029, 1033-34, 471 N.E.2d 530 (1984); *Plowman v. Fort Madison Community Hosp.,* 896 N.W.2d 393, 401 (Iowa 2017); *Reed v. Campagnolo*, 332 Md. 226, 240, 630 A.2d 1145 (1993); *Viccaro v. Milunsky*, 406 Mass. 777, 779 n.3, 551 N.E.2d 8 (1990); *Smith v. Cote*, 128 N.H. 231, 237-39, 513 A.2d 341 (1986); *Becker v. Schwartz*, 46 N.Y.2d 401, 409-10, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978); *Schirmer v. Mt. Auburn and Gynecologic Assoc. Inc.*, 108 Ohio St. 3d 494, 497-98, 844 N.E.2d 1160 (2006); *Owens v. Foote*, 773 S.W.2d 911, 913 (Tenn. 1989); *Naccash v. Burger*, 223 Va. 406, 413, 290 S.E.2d 825 (1982); *Wuth ex rel. Kessler v. Lab. Corp. of America*, 189 Wash. App. 660, 685, 359 P.3d 841 (2015).

The majority, taking a different view, concludes the *Arche* court did not simply plug the wrongful birth claim into the elements of medical malpractice because it "set restrictive conditions for when a breach of that duty would be actionable, and then further narrowed the traditional recovery principles for successful plaintiffs." Slip op. at 12. As to the limitation on liability, the majority noted: "The *Arche* court restricted actions for the invasion of the 'right to make an informed decision whether or not to seek an abortion' to only those circumstances when the child is 'severely and permanently handicapped.'"

33

Slip op. at 12 (quoting *Arche*, 247 Kan. at 281). As to damages, the *Arche* court held the John and Nicole Arche could not recover for emotional distress or for the expenses natural to raising any child. 247 Kan. at 282-91. I reject the majority's reasoning for four reasons.

First, the majority removes this discussion from its context. The *Arche* court limited the availability of the cause of action after citing and discussing the abortion statute in place at that time in Kansas. That statute, K.S.A. 21-3407, allowed an abortion in only three limited circumstances. The circumstance asserted by Nicole Arche was that her child suffered from a physical or mental defect. See 247 Kan. at 281; see *Poe v. Menghini*, 339 F. Supp. 986, 988 (D. Kan. 1972) (discussing statute).

Second, the majority creates a circular argument. If the child is healthy, then there is nothing from the prenatal testing that the physician failed to disclose. There would be no duty to inform nor would there be a breach of that duty. In other words, the fact that the child was not healthy is evidence of the breach of a duty and of damages, not a new element that must be proved.

Third, the *Arche* court's limitation on liability and on damages was the same type of rationale and a similar damage limitation as imposed by this court in *Johnston* when declaring that an action that could be characterized as a wrongful birth, wrongful conception, or wrongful pregnancy action was a medical malpractice claim. At the core of *Johnston* was the parents' assertion of their constitutional right to privacy that allows them to decide whether to procreate. *Johnston*, 241 Kan. at 412 (citing *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 [1973]; *Eisenstadt v. Baird*, 405 U.S. 438, 92 S. Ct. 1029, 31 L. Ed. 2d 349 [1972]; *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 [1965]). Because the surgeon interfered with this right, the court allowed recovery beyond damages directly experienced by the husband—the physician's

34

patient—for his pain and suffering and medical expenses; it allowed the patient's wife to recover her "cost of prenatal care, [of the] delivery, and of the tubal ligation" and for her "physical pain and suffering . . . in connection with the pregnancy, childbirth, and tubal ligation, and during a reasonable recovery period thereafter." *Johnston*, 241 Kan. at 413.

But this court in *Johnston*, as in *Arche*, also limited the scope of damages, holding the "damages cease at the time of the birth of the child." 241 Kan. at 413. This meant the Johnstons could not recover the costs incurred in caring for and raising the child or damages "for such items as lack of adequate time to care for all of the children, emotional suffering, loss of sleep, and worry about finances." 241 Kan. at 413.

Fourth, I would also note that the scope of allowed damages matters little. Causes of action are not defined by damages. "Damage is not the cause of action. It is merely a part of the remedy which the law allows for the injury resulting from a breach or wrong. The 'right of action' is merely the right to pursue a remedy, and the 'cause of action' is the concurrence of the facts giving rise to an enforceable claim." *Foster v. Humburg*, 180 Kan. 64, 67-68, 299 P.2d 46 (1956); see *Bruggeman v. Schimke*, 239 Kan. 245, 254, 718 P.2d 635 (1986); *Schmeck v. City of Shawnee*, 231 Kan. 588, 590, 647 P.2d 1263 (1982).

In summary, as in *Johnston*, different labels could describe the theory behind Tillman's and Fleetwood's allegations. But the essence of their claim rests on whether Tillman's physician had a duty to tell her the truth about the test results so she could make an informed decision about her medical treatment. This is the essence of a medical malpractice action based on the theory of a duty to ensure a patient's informed consent.

Both medical malpractice and its embedded theory of informed consent were recognized at common law. Although other justices cite some commentary suggesting

35

informed consent has evolved relatively recently, as this court stated in *Natanson v. Kline*, 186 Kan. 393, 406-07, 350 P.2d 1093 (1960), it is rooted in common law precepts:

> "Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment. A doctor might well believe that an operation or form of treatment is desirable or necessary but the law does not permit him to substitute his own judgment for that of the patient by any form of artifice or deception."

See also 3 Blackstone, Commentaries on the Laws of England, p. 122 (1893) (discussing malpractice).

The common law's recognition of self-determination also means a physician has "'a legal obligation to make a disclosure of the risks and dangers incident to a proposed medical or surgical procedure in order that his patient may make an informed consent thereto.'" *Funke v. Fieldman*, 212 Kan. 524, 532, 512 P.2d 539 (1973); see, e.g., *Tatro v. Lueken*, 212 Kan. 606, 617-18, 512 P.2d 539 (1973); *Yeates v. Harms*, 193 Kan. 320, 333-34, 393 P.2d 982 (1964). While informed consent cases usually deal with whether a patient was provided with the information needed to decide to submit to a procedure, it has been applied to cases in which a physician failed to notify a patient of the unfavorable results of a diagnostic test. See *Nold ex rel. Nold v. Binyon*, 272 Kan. 87, 105-06, 31 P.3d 274 (2001) (malpractice for physician to fail to inform pregnant patient if test results show she has a communicable disease that can be transmitted to the baby); see generally Annot., 49 A.L.R.3d 501.

This duty of a physician to advise a patient was recognized by United States courts before adoption of the Kansas Constitution. See *Twombly v. Leach*, 65 Mass. 397 (1853) (in case in which physician represented that a patient was doing well, but then she later

lost the use of her hand, court indicated a physician may be under a duty to inform patient of an unfavorable diagnosis in some circumstances). And because the medical malpractice action brought by Tillman and Fleetwood existed before the adoption of the Kansas Constitution, I would hold that K.S.A. 2020 Supp. 60-1906(a) violates section 5 of the Kansas Constitution Bill of Rights and is unconstitutional. See *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1133-34, 442 P.3d 509 (2019) ("'Section 5 preserves the jury trial right as it historically existed at common law when our state's constitution came into existence.'"); see *In re L.M.,* 286 Kan. 460, 476, 186 P.3d 164 (2008) (Luckert, J., concurring) ("[T]he uncompromising language of [section 5] applies if an examination of history reveals there was a right at common law to a jury trial under the same circumstances."). Because I reach that conclusion, I need not reach the question of whether the statute violates section 18 of the Kansas Constitution Bill of Rights.

I would reverse the judgment of the Court of Appeals and the district court.

ROSEN, J., joins the foregoing dissent.

\* \* \*

ROSEN, J., dissenting:  I question the test the majority has utilized to evaluate the constitutionality of K.S.A. 2020 Supp. 60-1906(a) under section 18 of the Kansas Constitution Bill of Rights. But even under its test, I would conclude K.S.A. 2020 Supp. 60-1906(a) is unconstitutional.

To determine whether K.S.A. 2020 Supp. 60-1906(a) violates section 18, the majority asks whether the plaintiffs' action existed at common law before Kansas adopted its Constitution in 1859. I am not convinced this is the right question. Section 18 provides that "[a]ll persons, for injuries suffered in person, reputation or property, shall have

37

remedy by due course of law, and justice administered without delay." Based on this language, it seems we should be asking whether the plaintiffs have suffered an injury—not whether they have suffered an injury that the common law considered injurious and actionable in 1859.

To be sure, the majority did not fabricate its test from whole cloth. It can be traced along a line of our caselaw back to 1976. In *Brown v. Wichita State Univ.*, 219 Kan. 2, 547 P.2d 1015 (1976), this court held that a statute immunizing state actors from tort liability did not violate section 18. The court reasoned:

"Section 18 does not create any new rights, but merely recognizes long established systems of laws existing prior to the adoption of the constitution. (See, 16 Am.Jur.2d, Constitutional Law, s 385, p. 721.) Since the right to sue the state for torts was a right denied at common law, such right is not protected by Section 18. This conclusion is consistent with our view that the laws at the time the constitution was framed are relevant in interpreting our constitution. (*Leek v. Theis*, supra 217 Kan. at 793, 539 P.2d 304.) It seems unlikely framers of our constitution intended Section 18 to abrogate governmental immunity. Were this true, our early court decisions would have reached that result. Instead, our prior decisions uphold governmental immunity." *Brown*, 219 Kan. at 10.

This reasoning fails to strike me as especially persuasive. The court provided no authority for this rule apart from a citation to a legal encyclopedia and the general position that laws in force at the time the Constitution was adopted are relevant to its interpretation. In place of authority, the court appears to have relied on the unfounded assumption that the founders would not have intended to protect a cause of action that was explicitly barred by the common law.

But even if the *Brown* court was correct in its assumption that the founders did not intend to protect remedies for injuries when the common law explicitly barred suits based on that injury, this fails to support an inverse of that notion—that the founders intended to protect remedies for injuries *only* if the common law explicitly *recognized* a cause of action based on the injury. This highlights the distinguishing factor between *Brown* and this case. When the *Brown* court interpreted section 18, it was constrained by very specific facts: at the time section 18 was adopted, the common law barred causes of actions against the State, and courts had not struck down governmental immunity in the almost 100-year history since section 18 had been adopted.

In contrast, the common law in 1859 did not explicitly bar the action the plaintiffs have brought here. In fact, as a medical negligence claim, the common law explicitly recognized this action and has done so for centuries. In his Commentaries on the Laws of England, first published between 1765 and 1770, William Blackstone explained that "mala praxis"—"neglect or unskillful management of [one's] physician, surgeon, or apothecary"—was actionable at common law. 3 Blackstone, Commentaries on the Laws of England, p. 122 (1983). I delve deeper into this point below.

This court expanded on the notion espoused in *Brown* in *Leiker ex rel. Leiker v. Gafford*, 245 Kan. 325, 778 P.2d 823 (1989), and brought the court's test to where it is today. There, the court held that legislation limiting recovery for a wrongful death action did not violate section 18 because "there was no cause of action for wrongful death at common law" and section 18 "preserves . . . the right to remedy by due course of law only as to civil causes of action that were recognized as justiciable by the common law as it existed at the time our constitution was adopted." *Leiker*, 245 Kan. at 361. The *Leiker* court cited various authority for that proposition, but none of the authority offered support.

39

Rather than follow this line of cases deeper into the abyss in the name of stare decisis, I would allow it a full and critical examination. See *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1139, 442 P.3d 509 (2019) ("strict application of stare decisis must be tempered in constitutional cases because 'our allegiance must be to the Constitution itself, "not what we have said about it"'"). I suspect that upon close inspection, we would find a flawed test that fails our Constitution and the people it stands to protect. To offer constitutional protection to only those causes of action recognized in 1859 is to ossify tort law in an ever-aging time. Neither the common law nor the Constitution offer even a shimmer of a suggestion that this was intended.

In his separate opinion, Justice Stegall also criticizes the majority's test, noting that the common law was meant to evolve. Slip op. at 28-29 (Stegall, J., concurring in part and dissenting in part). It has, for example, adapted in accordance with our collective recognition that people should have control over their own medical care. Today the common law acknowledges that patients are entitled to information about their course of treatment and its alternatives. This is a relatively novel concept, one that emerged in the twentieth century as a result of "the liberal Western tradition of individual freedom over 'political life and personal development.'" Sheley, *Rethinking Injury: The Case of Informed Consent*, 2015 B.Y.U. L. Rev. 63, 71 (2015) (quoting Faden & Beauchamp, *A History and Theory of Informed Consent,* p. 10 [1986]).

The Supreme Court of Oregon recently rejected the notion that the framers of its constitution meant to tie the protections afforded by their constitutional remedy clause to the common law as it existed at a single point in time. In *Horton v. Oregon Health & Sci. Univ.*, 359 Or. 168, 183, 376 P.3d 998 (2016), the court observed that there was "no basis in the text of the remedy clause, its context, or its history from which [it could] conclude that the framers intended to limit the meaning of that clause to the concept of injury as it was defined in 1857." To the contrary, the court explained, "when the framers drafted the

40

Oregon Constitution in 1857, they would have understood that the common law was not tied to a particular point in time but instead continued to evolve to meet changing needs." 359 Or. at 183.

Like the Oregon Supreme Court, I see nothing in the text of section 18 that suggests our founders meant for the Constitution to protect a remedy only for those causes of action recognized in 1859. The text indicates that the question we ought to be asking is this: if their allegations are true, have the plaintiffs suffered an injury?

But even if I were to leave this stone unturned and embrace the majority's analytical guide, I could not join in my colleagues' conclusion. They have determined that the plaintiff's cause of action was novel in 1990 when *Arche v. United States*, 247 Kan. 276, 798 P.2d 477 (1990), was decided, because it has "non-traditional elements" and "non-traditional damage limitations" and because it recognizes a new injury. I disagree.

Presumably, when the majority points to "non-traditional elements" it is referring to the portion of *Arche* that held a cause of action for "wrongful birth" is only actionable if the child is "severely and permanently handicapped." 247 Kan. at 281. And the "non-traditional damage limitations" the majority describes is the *Arche* directive that plaintiffs are entitled to only economic damages for the costs the handicap imposes and cannot recover for emotional distress or the costs expected when raising any child. 247 Kan. at 282-83.

While I agree that these constructs impose contours on a medical negligence suit, they have not created a new cause of action. Rather, they have placed limits on an existing one. I do not see why this strips the remedy of constitutional protection. Statutes of limitation and damage caps similarly constrict existing causes of action by defining when a legal wrong is actionable and what damages a plaintiff can recover, but we have

41

not characterized these limits as all-mighty creators of new tort. See *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 120, 631 P.2d 222 (1981) (examining new shortened statute of limitations for personal injury actions against healthcare providers without any suggestion this created a new cause of action); *Hilburn*, 309 Kan. at 1134 (considering constitutionality of economic damage cap on personal injury action without suggesting this created a new cause of action).

Justice Stegall also observes that changes in the legal rules governing tort actions do not create new causes of action. Slip op. at 28 (Stegall, J., concurring in part and dissenting in part) (pointing to holding in *Lemuz v. Fieser,* 261 Kan. 936, 945, 933 P.2d 134 [1997], that recognition of new duty does not alter traditional negligence cause of action). He notes that this court has recently rejected the practice of dividing causes of action into several sub-categories, highlighting our refusal to denote "'negligent training'" and "'negligent supervision'" as separate torts. Slip op. at 27 (Stegall, J., concurring in part and dissenting in part) (quoting *Reardon v. King*, 310 Kan. 897, 906-07, 452 P.3d 849 [2019]).

The majority considers the *Arche* court to have also defined a new injury. Perhaps the majority is moved by the legal sources that indicate the common law did not recognize self-determination in medical care. See Sheley, 2015 B.Y.U. L. Rev. at 75 (explaining a "1957 California case . . . provided one of the first coherent formulations of the concern for a patient's interest in self-determination, conceived as a psychological need weighed against bodily welfare and the related concern of causing unnecessary alarm by informing a patient of highly remote risks of treatment"). But Chief Justice Luckert persuasively argues that informed consent has roots in common law. Moreover, even if this is a more recent concept, the majority cannot seriously be suggesting that every medical injury that would have been unrecognizable in 1859 results in a new tort. If this is the barometer for what gets constitutional protection, then advancements in

medical science will eventually extinguish any right to a remedy for medical negligence. This cannot be true; as this court has said before "the constitution must be given flexibility so that it may vibrate in tune with the vicissitudes of time." *State ex rel. Donaldson v. Hines*, 163 Kan. 300, 301, 182 P.2d 865 (1947).

The majority's hyper-focus on the differences between the medical negligence action here and medical negligence actions in 1859 has caused it to lose sight of its question:  would this cause of action be recognized as justiciable in 1859? In other words, would this set of facts give rise to a basis for suing in 1859? My answer is yes.

Medical malpractice actions were a part of the common law. "[D]efendants who practiced a common calling, such as surgeons, apothecaries, lawyers, farriers, and carpenters could be sued in assumpsit . . . by the eighteenth century. The underlying theory in such cases was negligence . . . . [T]he common law imposed on persons engaged in a common calling a duty of reasonable care and a standard of professional competence." Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law*, 51 Ohio St. L.J. 1127, 1132 (1990). Book III of Blackstone's Commentaries begins with John Locke's insistence that the breach of a private duty amounts to the deprivation of another's right, leading in tort law to the grant of a remedial privilege to the victim to respond to his or her injuries. Blackstone's list of personal tort actions included medical malpractice. Robinette, *Why Civil Recourse Theory Is Incomplete*, 78 Tenn. L. Rev. 431, 441-42 (2011). As a consequence, a physician who carelessly misreads an MRI scan in 2021 would be subject to essentially the same rules of duty and care as the physician who carelessly amputated the wrong limb in 1860.

The plaintiffs have alleged that the defendant owed them a duty as Alysia Tillman's doctor, breached that duty when she misread her sonogram, and caused them injury when Tillman was deprived of the choice to make an informed decision about her

body and her medical care. The *Arche* court's limits on what is really an injury and what damages are allowed does not negate the conclusion that the plaintiffs' general allegations of duty, breach, and causation would have given rise to suit in 1859. On this point, Justice Stegall and I align. He writes that "the basic elements of the tort alleged by the plaintiffs are no different than any run-of-the-mill negligence action recognized at common law . . . ." Slip op. at 26 (Stegall, J., concurring in part and dissenting in part). Even under the majority's test, I would conclude that K.S.A. 2020 Supp. 60-1906(a) violates section 18 of the Kansas Constitution Bill of Rights.

Before concluding, I turn to the overarching argument in Justice Stegall's separate opinion. Although I agree with some of his analytical points, I oppose his overall view that we cannot characterize the plaintiffs' alleged injury as an injury. He takes the position that the law should never regard "the lost chance to abort" as an injury. Slip op. at 24 (Stegall, J., concurring in part and dissenting in part). He points out that most courts do not consider the birth of a healthy child an injury, and consequently, characterizing the "lost opportunity to abort children with 'gross deformities' who will 'never be able to function as a normal human being'" is a severe manifestation of discrimination against people living with disabilities. Slip op. at 25 (Stegall, J., concurring in part and dissenting in part) (quoting *Arche*, 247 Kan. at 281). He suggests that we are at the precipice of a slippery slope that leads to eugenics.

In focusing on what he thinks a legal remedy here may imply about persons with disabilities, Justice Stegall ignores a core component of the injury in this case: the total affront to a patient's interest in self-determination and information concerning a course of medical treatment. He also disregards a very real and very tangible consequence of this affront: the life-long economic costs associated with providing the patient's child with the resources and support the child will need to function in a world that caters to the non-disabled. The Supreme Court of Iowa has described the type of injury contemplated in

44

these cases and its consequence, explaining that "the [] injury to the parents 'lies in their being deprived of the opportunity to *make an informed decision* to terminate the pregnancy, requiring them to incur extraordinary expenses in the care and education of their child afflicted with a genetic abnormality.'" *Plowman v. Fort Madison Community Hosp.*, 896 N.W.2d 393, 402 (Iowa 2017) (quoting *Garrison v. Med. Ctr. of Delaware Inc.*, 581 A.2d 288, 290 [Del. 1989]). Justice Stegall's position would leave those who face these consequences without any recourse and without any economic assistance from the tortfeasors who brought them about.

Further, both the majority's and Justice Stegall's positions would "'immunize those in the medical field from liability for their performance in one particular area of medical malpractice,'" namely, prenatal care and genetic counseling. *Plowman*, 896 N.W.2d at 408 (quoting *Bader v. Johnson*, 732 N.E.2d 1212, 1219-20 [Ind. 2000]). Not only this, they would immunize those who would willingly withhold information from a pregnant woman in an effort to prevent the patient from choosing abortion. I cannot reconcile these positions with the Kansas Constitution's protection of personal autonomy, which grants all individuals the right to make decisions regarding their body, health, family formation, and family life that can include whether to continue a pregnancy. See *Hodes & Nauser, MDs, P.A. v. Schmidt*, 309 Kan. 610, 650, 440 P.3d 461 (2019) (section 1 protects right to decide whether to continue pregnancy).

Rather than igniting a fire that spawns a systematic practice of selective human breeding, I believe that recognizing the injury in cases like the one alleged here simply ensures that patients receive competent medical care or compensation for proven damages if they do not, and, ultimately, that our court fulfills its duty to uphold the protections our Constitution demands.